**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | |
|---|---|
| TONY CLAPPER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 4:17-cv-00401-JHE |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION[1]**

Plaintiff Danny Monroe Clapper ("Clapper") seeks review, pursuant to 42 U.S.C. §§ 405(g) and 205(g) of the Social Security Act, of a final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying his application for supplemental security income ("SSI"). (Doc. 1). Clapper timely pursued and exhausted his administrative remedies. This case is therefore ripe for review under 42 U.S.C. § 405(g). The undersigned has carefully considered the record and, for the reasons stated below, the Commissioner's decision is **AFFIRMED.**

**I. Factual and Procedural History**

Clapper protectively filed an application for SSI on July 5, 2011, alleging disability beginning on January 1, 2007. (Tr. 62, 207). The Commissioner initially denied Clapper's claim, (tr. 85-87), and Clapper requested a hearing before an administrative law judge ("ALJ"), (tr. 93-95). After a hearing on April 11, 2013 (at which Clapper amended his onset date to October 11,

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties in this case have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 19).

2011, (tr. 404)), the ALJ denied Clapper's claim on June 21, 2013. (Tr. 64-81). Clapper sought review by the Appeals Council; it granted review, vacated the ALJ's decision, and remanded Clapper's claim for further proceedings. (Tr. 82-84).[2]

On remand, the ALJ held another hearing on March 30, 2015. (Tr. 444-73). On September 4, 2015, he again denied Clapper's claim. (Tr. 39-61). Clapper again sought review by the Appeals Council, but this time, on January 1, 2017, it denied his request for review. (Tr. 3-8). On that date, the ALJ's decision became the final decision of the Commissioner. On March 14, 2017, Clapper initiated this action. (Doc. 1).

Clapper was fifty-two years old on the date of the ALJ's last decision. (Tr. 39, 207). Clapper reported he quit school after the fifth grade and had previous work as an electrician and electrician's helper. (Tr. 180-206, 210-11, 221-24, 327, 332-33).

## II. Standard of Review[3]

The court's review of the Commissioner's decision is narrowly circumscribed. The function of this Court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). This court must "scrutinize the record as a whole to determine if the decision reached is

---

[2] The record contains only the first (page 1 of 3) and last (page 3 of 3) pages of the Appeals Council's remand order. (*See* tr. 83-84). Since, as noted below, the Appeals Council denied review of the ALJ's second decision — implicitly concluding the ALJ had satisfied its instructions on remand — this missing page does not appear relevant to the court's review.

[3] In general, the legal standards applied are the same whether a claimant seeks DIB or Supplemental Security Income ("SSI"). However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations for statutes or regulations found in quoted court decisions.

reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* It is "more than a scintilla, but less than a preponderance." *Id.*

This Court must uphold factual findings that are supported by substantial evidence. However, it reviews the ALJ's legal conclusions *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining the proper legal analysis has been conducted, it must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

### III. Statutory and Regulatory Framework

To qualify for disability benefits and establish his or her entitlement for a period of disability, a claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.[4] The Regulations define "disabled" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which

---

[4] The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499, revised as of April 1, 2007. The regulations referenced in this opinion are those that applied to Clapper's claim at the time the ALJ rendered his decision, rather than the currently-applicable regulations.

"must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1508.

The Regulations provide a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v).  The Commissioner must determine in sequence:

(1)     whether the claimant is currently employed;
(2)     whether the claimant has a severe impairment;
(3)     whether the claimant's impairment meets or equals an impairment listed by the [Commissioner];
(4)     whether the claimant can perform his or her past work; and
(5)     whether the claimant is capable of performing any work in the national economy.

*Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993) (citing to the formerly applicable C.F.R. section), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561, 562-63 (7th Cir. 1999); *accord McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).  "Once the claimant has satisfied steps One and Two, [he] will automatically be found disabled if [he] suffers from a listed impairment.  If the claimant does not have a listed impairment but cannot perform [his] work, the burden shifts to the [Commissioner] to show that the claimant can perform some other job."  *Pope*, 998 F.2d at 477; *accord Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  The Commissioner must further show such work exists in the national economy in significant numbers.  *Id.*

### IV. Findings of the Administrative Law Judge

After consideration of the entire record and application of the sequential evaluation process, the ALJ made the following findings:

At Step One, the ALJ found Clapper had not engaged in substantial gainful activity since July 5, 2011, his application date.  (Tr. 45).  At Step Two, the ALJ found Clapper has the following medically determinable impairments: history of mild osteoarthritis, knees, and small joint effusion, left knee; history of mild osteoarthritis and mild chondromalacia of the right knee; generalized

arthritis; lumbago; mood disorder, not otherwise specified, with mild features of anxiety, stable with medication compliance versus depressive disorder, not otherwise specified; and history of substance abuse, to wit: alcohol. (Tr. 45). However, the ALJ concluded none of these impairments, alone or in combination, cause greater than slight limitation in Clapper's capacity for work activity. (Tr. 46). Accordingly, he determined the impairments are nonsevere, (tr. 60-61), that Clapper had not been under a disability since his application date, (tr. 61).

## V. Analysis

Although the court may only reverse a finding of the Commissioner if it is not supported by substantial evidence or because improper legal standards were applied, "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)). The court, however, "abstains from reweighing the evidence or substituting its own judgment for that of the [Commissioner]." *Id.* (citation omitted).

Clapper raises five objections to the denial of SSI: (1) the ALJ failed to accord proper weight to the opinion of Dr. Glenn Archibald, Clapper's treating physician; (2) the ALJ failed to accord proper weight to the opinion of Dr. Dana Davis, and instead substituted his opinion for hers; (3) Clapper meets Listing 12.04 and/or Listing 12.05C; (4) the finding Clapper can perform his past work is not supported by substantial evidence; and (5) the ALJ is biased against claimants in general, which tainted his decision. (Doc. 12 at 2). Upon review of the parties' briefing and the record, none of these grounds supports reversal. The undersigned has combined some of these arguments for convenience, but all are addressed below.

### A. The ALJ Properly Assessed Opinion Evidence

### 1. The ALJ Was Not Required to Defer to Dr. Archibald's Conclusion Clapper Meets Listing 12.04[5]

Clapper argues the ALJ improperly assigned little weight to the opinion of his treating physician, Dr. Archibald.

A treating physician's testimony is entitled to "substantial or considerable weight unless 'good cause' is shown to the contrary." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)) (internal quotations omitted). The weight to be afforded a medical opinion regarding the nature and severity of a claimant's impairments depends, among other things, upon the examining and treating relationship the medical source had with the claimant, the evidence the medical source presents to support the opinion, how consistent the opinion is with the record as a whole, and the specialty of the medical source. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d). Furthermore, "good cause" exists for an ALJ to not give a treating physician's opinion substantial weight when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (citing *Lewis*, 125 F.3d at 1440); *see also Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991) (holding that "good cause" existed where the opinion was contradicted by other notations in the physician's own record).

---

[5] The Listing of Impairments describes, for each of the major body systems, impairments considered severe enough to prevent a person from doing any gainful activity. *See* 20 C.F.R. § 404.1525(a). Listing 12.04 specifically refers to depressive, bipolar and related disorders. *See* 20 C.F.R. § 404.00, Subpart P, Appendix 1, Listing 12.04.

The ALJ reviewed Clapper's visits to Dr. Archibald, which began on August 11, 2011. (Tr. 56-57). On that visit, Clapper reported depression due to his house burning to the ground, along with lack of energy and motivation. (Tr. 366). Clapper stated he was not interested in working since his house burned down. (*Id.*). Clapper's seven visits to Dr. Archibald from November 10, 2011, to January 26, 2015, also indicated depression and anxiety, attributable to the death of loved ones and financial stress, (tr. 364); the death of his father and being out of work (although he reported feeling better "before all this came up"), (tr. 362); relationship stress (although he "still manages to function with meds if non-stressful environment"), (tr. 361); his wife using drugs and wanting a divorce, while Clapper had no money for a lawyer, (tr. 360); feeling overwhelmed and cheated by the system after his wife divorced him and took everything after thirty years, along with finding out his wife had been having an affair for several years before the divorce, (tr. 356); and "ongoing" issues, (tr. 379). Other than Clapper's mood/affect, his presentation was mostly normal, with his insight, judgment, appetite, and energy/motivation ranging from good to fair, his thought processes logical, his thought content within normal limits, his memory intact, his appearance appropriate; Clapper was uniformly oriented to person, place, and time. (*See* tr. 356-379). On two occasions, however — November 10, 2011, (tr. 365), and February 9, 2012, (tr. 364) — Clapper's energy/motivation was reported as "poor," and Clapper suffered from occasional sleep disturbances, (tr. 364 (hypersomnia on February 9, 2012), tr. 360 (insomnia on November 13, 2013)).

On March 19, 2015, Dr. Archibald completed an Affective Disorders Questionnaire in which he found Clapper suffered from depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or

worthlessness; and difficulty concentrating or thinking. (Tr. 377-78). As a result of this assessment, Dr. Archibald indicated Clapper has marked restriction of activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace, but no repeated episodes of decompensation, each of extended duration. (Tr. 378). Dr. Archibald also checked "yes" when asked if Clapper had a

> Medically documented history of a chronic affective disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> A. Repeated episodes of decompensation, each of extended duration; or
>
> B. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> C. Current history of 1 or more years inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

(*Id.*). Dr. Archibald did not indicate which of these three options applies.

The ALJ assigned Dr. Archibald's opinion little weight. (Tr. 57). He concluded while the record reveals Clapper has been treated for ongoing depression, the record did not support the limitations Dr. Archibald placed on Clapper's functioning. (*Id.*). The ALJ indicated "[t]he claimant reported on October 6, 2014, with complaints of depression and the next office visit was in January 2015, where he reported ongoing depression, then in March 2015, Dr. Archibald indicated that the claimant had marked limitations in all domains, which is inconsistent with the medical evidence of record and given little weight. His opinion warranted and received now [sic] weight." (*Id.*).

The only two specific critiques of Dr. Archibald's opinion Clapper offers are that the ALJ's wording makes it appear Dr. Archibald had treated Clapper less frequently than he had and that Dr. Archibald's responses to the questionnaire indicate Clapper meets Listing 12.04. (Doc. 12 at 20-22). The first of these is easily dismissed, as the ALJ's discussion of visits to Dr. Archibald dating back to August 11, 2011, (tr. 56-57) — the first visit to Dr. Archibald in the record — makes it clear he considered more than simply the "two or three visits" Clapper implies. The ALJ's decision is sufficient for the undersigned to conclude he considered the full extent of Clapper's treatment history with Dr. Archibald, notwithstanding the ALJ did not mention every visit in the paragraph in which he assigned Dr. Archibald's opinion little weight. *Cf. Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (noting "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision").

As for the second, the Commissioner argues Dr. Archibald's questionnaire simply asks him to opine on whether Clapper meets a listing, and, as such, is not a medical opinion; instead, it is an opinion on an issue reserved for the Commissioner, and is entitled to no particular weight. (Doc. 16 at 7-8). Opinions on some issues, including whether or not a claimant is disabled, are not "medical opinions" within the meaning of the regulations (regardless of whether they come from a treating source), but are opinions on issues reserved for the Commissioner; they are administrative findings that are dispositive of a case. 20 C.F.R. § 404.1527(d)(2); *Lee v. Comm'r, Soc. Sec. Admin.*, 551 F. App'x 539, 542 (11th Cir. 2014). An ALJ is free to discount such an opinion if it is unsupported by medical evidence or is conclusory. *Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir.1987). Consistent with the Commissioner's characterization, the questionnaire completed by Dr. Archibald is a mirror image of Listing 12.04, and leaves no room for anything other than confirmation or negation. *Compare*, 20 C.F.R. § 404.00, Subpart P, Appendix 1, Listing

12.04 *with* (tr. 377-78). Clapper's briefing also supports he intends the questionnaire to comprise Dr. Archibald's opinion as to whether Clapper meets Listing 12.04, stating "the claimant's treating physician of 6 years specifically indicated that the claimant meets Listing 12.04." (Doc. 12 at 21; doc. 17 at 3).[6]

Faced with a conclusory, nonmedical opinion, the ALJ did not err in rejecting it. Dr. Archibald's treatment notes do not reflect marked restriction of Clapper's daily activities, difficulties in social functioning, or difficulties in maintaining concentration, persistence or pace. Instead, as discussed above, they show ongoing treatment for depression (which the ALJ acknowledged) with only occasional abnormal findings in energy/motivation or sleep pattern. Nothing in Dr. Archibald's notes supports the level of restriction contained in the questionnaire, nor do his objective medical findings bolster them in any way.

Beyond the questionnaire itself, Clapper identifies nothing consistent with Dr. Archibald's opinion beyond Clapper's own testimony about his daily activities. At the second hearing, Clapper testified he spent most of his day in his bedroom at his mother's house due to the fact "people get on [his] nerves" (a problem that caused him trouble on his last job), has trouble sleeping, has no interesting in activities he used to do, has low energy, gets sad all the time and mad for no reason, forgets things and has a hard time remembering things, has difficulty concentrating, and feels guilty and worthless. (Tr. 461-63). However, the ALJ implicitly found this testimony inconsistent with the record in concluding Clapper did not meet Listing 12.04.[7] Considering the record (and

---

[6] As with every issue he raises, Clapper's reply brief simply copies and pastes his argument from his brief in support of disability. Consequently, rather than address the Commissioner's argument Dr. Archibald's questionnaire is not a medical opinion, Clapper doubles down on his reliance for Dr. Archibald's opinion on an issue reserved for the Commissioner.

[7] The ALJ also made extensive adverse credibility findings, which Clapper does not contest

overlapping with Listing 12.05C, discussed below), the ALJ found the evidence supported no limitation in Clapper's activities of daily living under the "paragraph B" criteria;[8] Clapper was "mentally able to initiate, sustain, and complete activities such as attending to his personal care, shopping[,] driving, independent of direction or supervision." (Tr. 58). The ALJ also concluded Clapper has no limitations in social functioning due to his work history with four employers, his period of self-employment as an electrician (during which he would have "interacted with general contractors, peer-subcontractors, and possibly individuals as he plied his trade"), and his presentation to the psychologist with his wife, grandchild, and two phones. (*Id*.). The ALJ also determined Clapper had mild limitations in concentration, persistence, or pace. (*Id*.). Although Clapper left school after the fifth grade, the ALJ concluded he did so because he was disinterested, wanted to get married, and "figured he would just go to work." (Tr. 46, 58). Referring to his extensive discussion of Clapper's work history, which contained multiple periods of time when Clapper reported no taxable income but was clearly working, (*see* tr. 45-49), the ALJ found Clapper started working as an electrician or electrician's helper by age 18 and continued to increase his income prior to age 22 and multiple times after that age. (Tr. 58). Consequently, because there was no intervening impairment that would cause Clapper "to be illiterate or suffer any deficit in intellectual or cognitive functioning," the ALJ found no more than mild limitations in this functional area. (Tr. 58-59).

---

in this appeal.

[8] When a claimant alleges a mental impairment, an ALJ rates four "broad functional areas" to determine the degree of functional limitation resulting from that impairment: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3) and 416.920a(c)(3); 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00.

The conclusion the ALJ did not err in assigning little weight to Dr. Archibald's opinion also disposes of Clapper's argument he meets Listing 12.04, which is founded entirely on his statement "Dr. Archibald has treated Mr. Clapper since 2010." (Doc. 12 at 27). A claimant asserting he meets a Listing bears the burden of "present[ing] specific medical findings that meet the various tests listed under the description of the applicable impairment." *Wilkinson ex rel. Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987) (per curiam). As noted above, the record contains no support for the restrictions that would support a finding of disability at the Listing. Therefore, reversal is unwarranted on this portion of Clapper's third ground as well.

### 2. The ALJ Did Not Err in Rejecting Dr. Davis's Opinion

Next, Clapper argues the ALJ did not accord proper weight to the opinion of Dr. Davis, a consulting psychologist. (Doc. 12 at 23-27). The entirety of Clapper's argument as it applies to this case is, without elaboration or reference to a specific part of the ALJ's decision, that the ALJ substituted his opinion for Dr. Davis's. (*Id.* at 24). The remainder of Clapper's argument is boilerplate citation to law supporting an ALJ may not do this. (*See id.* at 24-27).[9]

---

[9] The Commissioner argues Clapper has "waived any issue regarding the ALJ's evaluation of Dr. Davis's report" by failing to allege a specific error. (Doc. 16 at 11). In support, the Commissioner cites two Eleventh Circuit cases, each of which cites a line of authority that applies to appeals from district court rulings under the Federal Rules of Appellate Procedure. *See N.L.R.B. v. McClain of Georgia, Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998) (citing Fed. R. App. P. 28(a)(4) in concluding issues were inadequately raised on appeal); *Outlaw v. Barnhart*, 197 F. App'x 825, 828 n.3 (11th Cir. 2006) (citing *Cheffer v. Reno*, 55 F.3d 1517, 1519 n.1 (11th Cir. 1995), which in turn cites Fed. R. App. P. 28(a)(5)). Clapper has not responded to this argument. Although the Eleventh Circuit has held the rule "applies with equal force in social security appeals," *Buttram v. Comm'r of Soc. Sec.*, 594 Fed.Appx. 569, 572 (11th Cir. 2014), courts in this district have concluded the rule "applies to briefs filed in the federal *circuit* court, not briefs filed in the federal *district* court." *Weems v. Astrue*, No. 3:11-CV-03083-KOB, 2012 WL 2357743, at *8 (N.D. Ala. June 19, 2012). Consequently, courts in this district have generally "reviewed the record to determine whether the ALJ properly applied legal standards and supported his factual conclusions with substantial evidence," even when a plaintiff does not file a brief. *Id. See also Williams v.*

Dr. Davis evaluated Clapper on December 20, 2011. (Tr. 331-35). Clapper indicated to Dr. Davis he was applying for disability benefits due to various physical limitations, but also reported a history of functional illiteracy. (Tr. 332). Clapper reported completing the fifth grade, but quitting because "he had failed a grade or two and was just not interested and felt that he should just go to work." (*Id.*). Dr. Davis noted she had a datasheet from the Calhoun County public school system, indicating Clapper had been tested in June 1975 with a WISC-R Instrument, resulting in a full-scale IQ score of 71. (*Id.*). Clapper was placed in the EMR program at that time.[10] (*Id.*). Clapper also reported an inability to complete job applications due to his illiteracy. (Tr. 333). However, Dr. Davis observed Clapper was "independent in all of his activities of daily living." (Tr. 333-34).

Dr. Davis found Clapper had normal/alert mentation and was oriented in all spheres, with logical but rather concrete thought processes and slightly below average abstract thinking. (Tr. 334). She administered the Wechlser-Bellevue Intelligence Scale IC ("WAIS-IV") test, concluding Clapper's verbal comprehensive index was 70, his perceptual reasoning index was 69, his working memory index was 71, his processing speed index was 62, and his full-scale IQ was 63. (Tr. 334-35). Dr. Davis characterized Clapper's effort on the exam as "pretty good," and felt the score represented "a fair estimate of his current intellectual functioning." (Tr. 335). She also found the score was "somewhat similar" to Clapper's 1975 IQ score of 71. (*Id.*). Based on this,

---

*Colvin*, No. 4:15-CV-0906-JEO, 2016 WL 4180896, at *6 (N.D. Ala. Aug. 8, 2016), *aff'd sub nom. Williams v. Comm'r, Soc. Sec. Admin.*, 703 F. App'x 780 (11th Cir. 2017) (declining to find an issue waived when plaintiff raised it, albeit in a perfunctory manner, and did not respond to Commissioner's argument the issue was waived). Although the undersigned discusses whether the ALJ erred in his evaluation of Dr. Davis's report, giving Clapper the benefit of the doubt the issue has been raised at all, Clapper's failure to adequately brief the issue gives the undersigned no hint at which aspect of the decision he contends is problematic.

[10] "EMR" refers to "educable mentally retarded." (Tr. 50).

Dr. Davis described Clapper's IQ as in the mildly retarded range. (*Id.*). She further tested Clapper on simple words, including on the Vocabulary subtest (on which Clapper received a scaled score of 05), finding Clapper "does appear to be functionally illiterate." (*Id.*). However, Dr. Davis did not opine on any employment-related restrictions or limitations.

The ALJ thoroughly discussed Dr. Davis's opinion and his reasons for assigning it little weight to her conclusions Clapper's IQ score reflected his current intellectual functioning and that Clapper was functionally illiterate. (Tr. 52-54, 58-59). Specifically, the ALJ found the evidence, including Clapper's work history, undermined the conclusion he functioned in the mildly retarded range. (Tr. 51). The ALJ found Clapper's reported work history, which indicated he began working as an electrician or electrician's helper in 1986, at age 23, to be "grossly erroneous." (Tr. 46). The ALJ highlighted Clapper's statement to Dr. Davis that he had left school at 14 to get married and work, but that Clapper's work history report reflects he did essentially nothing for nine to ten years. (Tr. 47). However, Clapper testified his father, himself an electrician, trained him. (Tr. 407-08). Consistent with the fact Clapper had not reported other income during lengthy periods of his work history (for example, between 1990-97, (tr. 49, 193, 203)), the ALJ concluded Clapper had begun working in 1977, at age 14, when he left school. (Tr. 47). Additionally, Clapper's testimony and the evidence showed Clapper had two jobs in 1981, at the age of 18). (*Id.*). The ALJ found the evidence strongly suggested one of these jobs, at Alabama Engineering & Supply, was in the electrical field and was skilled work. (*Id.*). The ALJ also noted the evidence shows Clapper began working as an electrician at McLeod Electric Company in 1982 (not 1989, as previously reported), earning substantially more than the threshold for SGA during the years 1982-1984. (Tr. 47-48). Other inconsistencies between the work history report, Clapper's testimony, and Clapper's earning record led the ALJ to conclude he had consistently pursued

14

skilled work as an electrician or electrician's helper through his entire working history.[11]  (Tr. 48-50).  Although Dr. Davis discussed Clapper's work in broad terms, the ALJ found "she never discussed his past relevant work, how he learned said work (other than his father) or how he was able to perform such work despite being mildly mentally retarded and functionally illiterate."  (Tr. 53).

The ALJ also found no objective evidence supported Clapper's illiteracy.  (Tr. 59).  He noted while there are subjective reports in the record suggesting illiteracy, the second vocational expert testified an illiterate person could not have performed the work Clapper performed.  (Tr. 59, 465, 468).  And he found Clapper's testimony as to his literacy was not credible.  (Tr. 49).  Specifically, the ALJ noted he rejected Clapper's testimony he was only able to function as an illiterate electrician or electrician's helper because others read blueprints to him, noting Clapper had been self-employed for some time and there is no record evidence of hiring others to assist him.  (Tr. 51).  The ALJ also pointed to Clapper's fifth-grade report card, which reflects Clapper received an F for each quarter in Language, an F for each quarter in Spelling, a D for each quarter in Reading, a D for each quarter in Handwriting, a D for three quarters and an F for one quarter in Arithmetic, an F for three quarters and a D for one quarter in Social Studies, and an F for each quarter in Health and Science.  (Tr. 288).  The ALJ noted Clapper's Ds in Reading and Handwriting were "the only subjects in which *he did not suffer significant subaverage functioning,*" undermining Clapper's claims of illiteracy.  (Tr. 51) (emphasis in original).

---

[11] The ALJ noted both vocational experts that testified in this case reported the jobs Clapper performed were at least semiskilled, and the second vocational expert testified the jobs were skilled.  (Tr. 50-51).  Siding with the second, the ALJ observed the first vocational expert had classified Clapper's work as an electrician helper due to his lack of education rather than the physical and mental skills necessary to do the work.  (Tr. 50-51, 433).

The ALJ's decision to assign Dr. Davis's opinion little weight was supported by substantial evidence. First, because Dr. Davis is a non-treating physician, the ALJ was not required to give her opinion any particular weight. *See Hankins v. Astrue,* No. 4:11–cv–2426–RDP, 2012 WL 4479242, at *8 (N.D.Ala. September 24, 2012) (citing *Russell v. Astrue,* 331 F. Appx. 678, 681–82 (11th Cir.2009)). It was not error in and of itself for the ALJ to assign it little weight, nor was he required to point to good cause for discounting it. Second, "a valid IQ score need not be treated as conclusive of intellectual disability where the IQ score 'is inconsistent with other evidence in the record on the claimant's daily activities and behavior.'" *Jones v. Soc. Sec. Admin., Comm'r*, 695 F. App'x 507, 509 (11th Cir. 2017) (quoting *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992)). The ALJ was entitled to find other evidence in the record undermined Dr. Davis's conclusions as to Clapper's functioning. Clapper does not take issue with any of the evidence the ALJ cited (with the exception of the report card, discussed below), nor does he point to any testimony or evidence that would undermine the conclusions the ALJ reached. Consequently, reversal is not warranted on this ground.

### B. Substantial Evidence Supports the ALJ's Conclusion Clapper Did Not Meet Listing 12.05C

Clapper's argument he meets Listing 12.05C is centered entirely on the ALJ's conclusion, based on his assessment of Clapper's work history, he did not suffer significant subaverage intellectual functioning or any deficit in adaptive functioning prior to age 22 (or at any point in the record). The Commissioner contends Clapper failed to meet his burden to prove his impairment meets the Listing.

At the time the ALJ rendered his decision, Listing 12.05C, which relates to intellectual disability, read:

12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. § 404.00, Subpart P, Appendix 1, Listing 12.05. The introductory paragraph to Listing 12.00 indicates: "If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing . . . For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c)." 20 C.F.R. § 404.00, Subpart P, Appendix 1, Listing 12.00.

Clapper's evidence for disability prior to age 22 is his fifth-grade report card and a form entitled "Data Sheet for Inactive Special Education Student." (Doc. 12 at 28). As noted above, the report card reflects Clapper received Ds and Fs. (Tr. 288). The report card also contains a note stating "Tony is very lazy in doing his work. He spends more time getting into trouble." (*Id.*). The ALJ found the latter statement indicated Clapper did not fail due to intellectual or cognitive functions. (Tr. 50). He also found it puzzling that the document, which purports to be a two-page fifth-grade report card, would indicate that Clapper should be progressed to the sixth grade, (tr. 287), in light of his record of Ds and Fs. (Tr. 50). Clapper takes issue with the ALJ's conclusion the report card did not show significant subaverage functioning in reading or handwriting, stating

"both D's and F's are subaverage," (doc. 12 at 28), but the ALJ's statement was directed, in a clearly indicated aside, to Clapper's claims of illiteracy. (Tr. 51). As for the "Data Sheet," it is a one-page, unsigned IQ test that indicates Clapper received a full-scale IQ score of 71. (Tr. 220). Not only is that score insufficient to meet the requirements of the listing if valid, there is nothing to support its validity.

Contrary to Clapper's implication, the report card is not the only evidence the ALJ used to reject the notion Clapper meets Listing 12.05C. As discussed above, the ALJ found Clapper's ability to do skilled electrician or electrician's helper work prior to age 22 supported that he had no discernable significant subaverage intellectual functioning or any deficit in adaptive functioning prior to that age. (Tr. 46-51). And, as discussed above, the ALJ determined Clapper's work history, which required skilled labor and the ability to interact with others, did not support a finding of intellectual disability. Finally, even though the ALJ did not find intellectual disability was a severe (or even a medically determinable) impairment,[12] his discussion of the "paragraph B" criteria explicitly discussed Listing 12.05 and found the evidence supported at most mild functional limitations. (Tr. 58-59). The ALJ's conclusion Clapper does not meet Listing 12.05C is supported by substantial evidence.

### C. The ALJ Did Not Find Clapper Could Perform His Past Relevant Work

Clapper contends the ALJ erred by finding he could perform his past relevant work. (Doc. 12 at 29-33). Clapper points to the ALJ's first decision for this error, but the ALJ's first decision was vacated by the Appeals Council. (Tr. 82-84). A vacated decision is void. *Cunningham v.*

---

[12] The Commissioner notes that Clapper does not challenge the ALJ's finding intellectual disability is not a severe impairment, but the criteria required for a finding of intellectual disability under Listing 12.05C are the same as those for finding a severe impairment. 20 C.F.R. § 404.00, Subpart P, Appendix 1, Listing 12.00.

*Colvin*, No. 4:13-CV-00485-LSC, 2014 WL 4458894, at *3 (N.D. Ala. Sept. 9, 2014) (citing *United States v. Sigma Int'l, Inc*., 300 F.3d 1278, 1280 (11th Cir.2002) for the proposition "opinions or decisions that have been vacated 'are officially gone,' 'void,' and 'have no legal effect'). In the second, controlling decision, the ALJ ended his analysis at Step Two. Therefore, Clapper has not pointed to an error with the decision he appeals from.

### D. Clapper Has Not Shown Reversible Bias

Finally, Clapper argues the ALJ in this case is biased against claimants in general, and against him specifically.

The court must start from the presumption that an ALJ is unbiased and acts with honesty and integrity. *Schweiker v. McClure*, 456 U.S. 188, 195 (1982); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). "This presumption can be rebutted by a showing of conflict of interest or some other specific reason for disqualification," and the burden to do so is on the party asserting bias. *McClure*, 456 U.S. at 195. Specifically, the party must show convincing evidence that "a risk of actual bias or prejudgment" is present. *Withrow*, 421 U.S. at 47. "[J]udicial rulings, routine trial administration efforts, and ordinary admonishments (whether or not legally supportable) to counsel and to witnesses . . . [which] neither (1) rel[y] upon knowledge acquired outside [the] proceedings nor (2) display[] deep-seated and unequivocal antagonism that would render fair judgment impossible," are inadequate to require disqualification. *Liteky v. United States*, 510 U.S. 540, 556 (1994).

As to the first of Clapper's arguments, that the ALJ's 14% approval rate demonstrates bias (compared to a 48% approval rate by other ALJs), the Eleventh Circuit has consistently rejected the same argument raised by Clapper's counsel. *See Putman v. Soc. Sec. Admin., Comm'r*, 705 F. App'x 929, 936 (11th Cir. 2017) (holding "a generalized assumption of bias derived from the ALJ's

low approval rate is insufficient to rebut the presumption of impartiality");[13] *Contreras-Zambrano v. Soc. Sec. Admin., Comm'r*, 724 F. App'x 700, 703 (11th Cir. 2018) (same; also noting the court's concern is with the instant case).

Clapper's second argument has more support, but still ill-founded. First, he points to a paragraph in the ALJ's opinion:

> The claimant testified that he left school *at age 14 to get married and work*, not because of his aptitude, or lack thereof, for learning. However, despite pursuing the responsibilities of a husband and father, *he did not work as an electrician until he was 23/24.* The claimant married in 1977; and despite these responsibilities, the claimant did not begin working until 1986-87, a gap of 9-10 years after he left school and married. This is allegedly so, even though the claimant had access to his father, a skilled electrician for the entire 9-10 year period. *Despite his responsibilities, he did nothing for a decade and his father waited a decade to train him.* The claimant's report of inability to learn is likewise incredible. **Per his testimony and appeal, he did nothing for 9-10 year [sic], except have two children.** Nonetheless, *instead of his already alleged inability to learn depreciating further, at the end of the 9-10 [sic] period, the claimant was able to pick up a skilled trade.* The claimant's report is not credible. **Commonsense dictates** that the claimant's father trained him as an electrician as soon as he left school and married. The record contains absolutely no medical, objective, or logical reason to believe that the claimant's father waited 9-10 [sic] to train his—*untrainable*—son, a son that was married with children. It is by far more logical to assume that the claimant began working with or at least for his father in 1977 when he left school. **Based on the totality of the evidence, it is also logical to assume that this work activity was not reported for tax purposed [sic], as there is a good chance the claimant's father could not report that his 14 year old was working and not attending school.**

(Doc. 12 at 33) (quoting tr. 47, italicized emphasis in original, bolded emphasis added by Clapper).

Clapper argues this comprises "a substantial paragraph berating claimant for not working for 10 years after he married," which he contends misstates his testimony. (*Id.*). In actuality, Clapper

---

[13] Notably, *Putman* involved the same ALJ as this case. *See Putman v. Colvin*, No. 4:16-CV-0061-RDP, 2016 WL 5253215, at *6 (N.D. Ala. Sept. 22, 2016), *subsequently aff'd sub nom. Putman v. Soc. Sec. Admin., Comm'r*, 705 F. App'x 929 (11th Cir. 2017).

testified he helped his father when he was young, and did electrical work his entire life. (Tr. 455). However, even if this misstates some of Clapper's testimony, it does not establish bias. As discussed above, Clapper's work history report indicates he began working in 1987. (Tr. 221). The paragraph Clapper cites discusses why the ALJ does not credit that report; rather than berate Clapper, the ALJ points to the unbelievability of the work history report.

Clapper next points to the ALJ's characterization of his visit to Dr. Davis, at which Clapper carried a second phone (which the ALJ assumed was a work phone) and said he did not have a good relationship with his father (which the ALJ found inconsistent with Clapper's work for his father). (Doc. 12 at 34) (citing tr. 53). It is unclear how either would establish bias. Finally, Clapper takes issue with the ALJ's assessment of his literacy, noting the ALJ follows a quote of Clapper's fifth-grade teacher that he is "lazy" with "[t]hat statement appears to be authentic." (Doc. 12 at 35). Clapper follows this by noting the ALJ discounted a variety of testing to determine he is not illiterate. (*Id*.). As discussed above, substantial evidence in the record supports the ALJ's decision, even if other evidence may cut against it. And while the ALJ's quote of Clapper's teacher is unflattering to Clapper, the ALJ's reference to the statement's authenticity calls back to his original discussion of the statement, in which he states of the fifth-grade report card that "this document has all of the trappings of authenticity." (Tr. 50). This does not show bias either.

This case is readily distinguishable from *Miles v. Chater*, 84 F.3d 1397 (11th Cir. 1996), the case Clapper cites. In *Miles*, the ALJ referred to an expert's "almost invariabl[e]" conclusions on behalf of the claimant's attorney that other claimants are disabled. *Id.* at 1399. The district court observed that no evidence in the record supported this statement, but affirmed because the decision was otherwise supported by substantial evidence, and no circuit precedent required reversal. *Id.* at 1400. The Eleventh Circuit reversed, noting the ALJ's observations about the

expert's opinions for the attorney's other clients was unsupported by the record and reflected a "compromised" process. *Id.* at 1401. Here, however, there is nothing to indicate the ALJ had a preconceived opinion about evidence in this case. Nor does Clapper — whose burden it is to prove bias — point to any improper consideration by the ALJ. Therefore, reversal is not warranted on this basis.[14]

## VI. Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, the decision of the Commissioner of Social Security denying Clapper's claim for a period of disability and disability insurance benefits is **AFFIRMED**.

DONE this 23rd day of September, 2018.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE

---

[14] As part of his conclusion to this argument, Clapper briefly states the ALJ "failed to apply the Grid Rules, and based his residual functional capacity on an incomplete hypothetical question." (Doc. 12 at 36). Neither appears to apply to this case, where the ALJ ended his analysis at Step Two.